UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| TRE'VELL OATTS, | CASE NO. 3:25-cv-05798-DGE |
| Plaintiff, | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO COMPEL ARBITRATION (DKT. NO. 23) |
| v. | |
| CAPSTONE LOGISTICS LLC, | |
| Defendant. | |

This matter comes before the Court on Defendant's motion to compel arbitration (Dkt. No. 23).  Plaintiffs Vincent Jackson and Jesse Quindt are seeking to bring a class action in federal court; Defendant believes each is required to engage in individual arbitration only.  For the reasons articulated herein, Defendant's motion to compel arbitration is GRANTED in part and DENIED in part.  Jackson may continue to pursue his proposed class action in this forum.  Quindt, however, must individually arbitrate his claims.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO COMPEL ARBITRATION (DKT. NO. 23) - 1

# I    BACKGROUND

On November 4, 2025, Plaintiffs filed the operative complaint in this matter.  (Dkt. No. 20.)[1]  Plaintiffs were previously employed by Defendant and seek to bring a class action complaint on behalf of certain individuals currently or formerly employed by Defendant.  (*Id*. at 3.)  Plaintiffs allege Defendant forced them to work more than five hours without a thirty-minute meal break and more than four hours without a ten-minute rest break contrary to Washington law.  (*Id*. at 7–8.)  Plaintiffs further allege Defendant failed to keep accurate wage statements, required Plaintiffs abide by unlawful non-compete policies, failed to pay for rest breaks, and failed to pay overtime wages.  (*Id*. at 9–11.)  Plaintiffs bring nine causes of action under Washington state law seeking money damages and injunctive relief.  (*Id*. at 12–20.)

On November 18, 2025, Defendant moved to compel arbitration and dismiss class claims.  (Dkt. No. 23.)  Defendant argues both Plaintiffs signed an arbitration agreement "during their onboarding process" agreeing to "arbitrate all claims relating to their employment" and are now bound by these agreements.  (*Id*. at 2.)

The two named plaintiffs did not work for Defendant at the same time, did not work in the same role, and did not sign the same arbitration agreement.  Jackson worked for Defendant from December 27, 2022 until December 2, 2023; his last work day was October 27, 2023.  (Dkt. No. 23-1 at 3.)  Jackson does not remember signing any arbitration agreement.  (Dkt. No. 28 at 1).  Defendant identifies that Jackson signed an arbitration agreement on December 29, 2022.

---

[1] A different plaintiff filed the original complaint in Pierce County Superior Court, which subsequently was removed to this Court on September 8, 2025.  (Dkt. No. 1.)  While the prior plaintiff remains named in this caption, Jackson and Quindt are now the only named Plaintiffs in this matter.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO COMPEL ARBITRATION (DKT. NO. 23) - 2

(Dkt. Nos. 23-1 at 5; 32-1 at 2.)  Sections 2 and 3 of the identified agreement require Jackson

arbitrate Covered Claims, which are defined as:

> [A]ny claim, dispute, and/or controversy that I may have against the Company, or that the Company may have against me, whether based on tort, contract, statute (including but not limited to any claims of . . . unpaid wages, whether they be based on . . . the Fair Labor Standards Act, or any other similar federal, state or local law or regulation which may apply to the parties' employment relationship), equitable law, or otherwise.

(Dkt. No. 23-1 at 8.)  Section 3 furthers defines Covered Claims to include "any claim, dispute,

and/or controversy that may arise out of or be related in any way to my employment, including

but not limited to the termination of my employment and my compensation."  (*Id*.)  Section 5 of

the agreement states that "Covered Claims will be arbitrated only on an individual basis":

> All claims subject to this Agreement shall be brought in the individual capacity of myself or the Company, and shall be brought in the county in which the dispute arose (unless the parties mutually agree otherwise).  This agreement shall not be construed to allow or permit the consolidation or joinder of other claims or controversies involving any other employees or parties, or permit such claims or controversies to proceed as a class or collective action.  I and the Company agree to waive any substantive or procedural rights that we may have to participate in, bring, or receive monetary or other relief from any action on a class or collective basis against each other.

(*Id*. at 9.)  The saving-clause provision in section 12 details a distinction between section 5 and

the rest of the agreement:

> If any term, provision[,] or portion of this Agreement is determined to be void or unenforceable, it shall be severed and the remainder of this Agreement shall be fully enforceable; provided, however, that if the waiver of class and collective claims is found to be unenforceable, then any claim brought on a class, collective[,] or representative action basis must be filed in a court of competent jurisdiction, and such court shall be the exclusive forum for such claims.

(*Id*. at 10.)  Finally, Section 14 of the agreement identifies the agreement is made pursuant to the

Federal Arbitration Act ("FAA").  (*Id*.)  No other choice of law provision is included.

In contrast, Quindt worked for Defendant for a "few weeks" beginning on September 5,

2024.  (*Id*. at 3.)  Quindt did not sign any arbitration agreement either before or during this time.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO COMPEL
ARBITRATION (DKT. NO. 23) - 3

(*See id.* at 1.)  In late May or June 2025, Quindt attended a "one-day orientation process" organized by Defendant.  (*See* Dkt. No. 29 at 3.)  Quindt identifies that Defendant contacted him with an offer, informing him that he "could potentially be rehired if [he] completed an orientation program." (*Id.*)  During the orientation, Quindt signed various documents, but asserts his understanding was that such documents "related only to potential future employment, not [his] prior work with the company in 2024." (*Id.*)

Among the documents Quindt apparently signed was an arbitration agreement.  (*Id.*; Dkt. No. 23-1 at 23.)  By its terms, the agreement was effective on the date of signing.  (Dkt. No. 23-1 at 18, 23.)  It included an agreement to arbitrate all covered claims "arising out of or relating to the relationship between the Parties . . . whether arising before or after this Arbitration Agreement" (*Id.* at 15).  The agreement also states, "this Arbitration Agreement is governed by the [FAA]," but if the "FAA is held not to apply, this Arbitration Agreement will be governed by the arbitration laws of the State of Georgia." (*Id.* at 15.)  Finally, the agreement states, "no class, collective, consolidated, or representative arbitration of claims shall be allowed." (*Id.* at 17) (cleaned up).

Defendant asserts Quindt was "rehired on June 3, 2025, with his employment ending the second time on July 20, 2025." (*Id.* at 3.)  Quindt, however, identifies that after the one-day orientation, he "never actually performed any work for the company." (Dkt. No. 29 at 3.)  The record is void of any evidence showing Quindt performed any work on Defendant's behalf after attending the orientation.

**II      LEGAL STANDARD**

**A.  Formation of an arbitration agreement**

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO COMPEL ARBITRATION (DKT. NO. 23) - 4

As a threshold matter, the party seeking to compel arbitration bears the burden of proving by a preponderance of the evidence the existence of an agreement to arbitrate. *Ashbey v. Archstone Prop. Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015); *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014). "Arbitration is a matter of contract, and the [Federal Arbitration Act] requires courts to honor parties' expectations." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 351 (2011). Accordingly, when deciding whether the parties agreed to arbitrate a certain claim, courts "apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Likewise, "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements." *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996).

**B. The Federal Arbitration Act ("FAA")**

"The FAA was enacted in 1915 in response to widespread judicial hostility toward arbitration agreements." *AT&T Mobility LLC*, 563 U.S. at 339. The FAA generally limits courts in their ability to strike down arbitration agreements and reflects a "liberal federal policy favoring arbitration." *Id.* (quoting *Moses H. Cone Memorial Hospital v. Mercury Const. Corp.*, 480 U.S. 1, 24 (1983)). The FAA applies to contracts "evidencing a transaction involving commerce." 9 U.S.C. § 2; *Brennan v. Opus Bank*, 796 F.3d 1125, 1129 (9th Cir. 2015). In considering a motion to compel arbitration, the "court's role under the [FAA] is [] limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the

agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).[2]

But the FAA includes several exceptions from coverage. Section 1 of the FAA ("the transportation workers exemption") excludes from the FAA's coverage the "contracts of employment of seamen, railroad employees, or **any other class of workers engaged in foreign or interstate commerce**." 9 U.S.C. § 1 (emphasis added).

Determining whether the transportation worker exemption applies is a two-step analysis. *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022). The party advancing the exemption bears the burden of showing it applies. *Fli-Lo Falcon, LLC v. Amazon.com, Inc.*, 97 F.4th 1190, 1194 (9th Cir. 2024). The first step is defining the class of workers to which the plaintiff belongs. *Saxon*, 596 U.S. at 455. The second step of the inquiry is determining whether the class of workers is engaged in foreign or interstate commerce. *Id.* Any worker qualifying for the exemption "must at least play a direct and 'necessary role in the free flow of goods' across borders." *Id.* at 458 (quoting *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 121 (2001)). The individual need not directly travel across state lines. In *Saxon*, the Supreme Court held "airline employees who physically load and unload cargo on and off planes traveling in interstate commerce are, as a practical matter, part of the interstate transportation of goods." *Id.* at 457. And the Washington Court of Appeals held in an unpublished opinion, the individual need not even be directly responsible for loading the vehicle that will cross state lines. *Sayaseng v. Geodis Logistics, LLC*, No. 87485-3-1, 2025 WL 2762945, at *1, *3 (Wash. App. Ct. Sept. 29,

---

[2] Section 4 of the FAA provides a judicial remedy where a party seeks to compel arbitration. *See* 9 U.S.C. § 4. Under Section 4, "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction . . . of the subject matter of a suit arising out of the controversy between the parties," for an order compelling arbitration. *Id.*

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO COMPEL ARBITRATION (DKT. NO. 23) - 6

2025) (finding individuals who "mov[e] pallets of products and review[] outgoing shipments" and "pick[] products off the warehouse shelves and put them in boxes for shipment" where the goods will then enter interstate commerce fall within the FAA's transportation worker exemption).  In contrast, the exemption does not apply to individuals who are involved in only "intrastate transactions between local Walmart customers and their local Walmart stores" but not "interstate transactions between Walmart and its suppliers."  *Walz v. Walmart Inc.*, No. 3:23-cv-05083-BHS, 2024 WL 2864230, at *4–6 (W.D. Wash. June 6, 2024).

## III    ANALYSIS

### A. Jackson may pursue class action litigation.

  1. <u>Defendant shows by a preponderance of the evidence that Jackson signed his arbitration agreement.</u>

Courts must first "apply ordinary state-law principles that govern the formation of contracts" to determine whether the parties intended to agree to arbitrate the disputed claim. *First Options of Chicago, Inc.*, 514 U.S. at 944.  Plaintiffs challenge the agreement on the basis that Defendant failed to show by a preponderance of the evidence that Jackson signed the agreement.  (Dkt. No. 26 at 16–17.)  Plaintiffs do not argue that Jackson's claims are outside the alleged agreement or that the agreement is otherwise invalid.

Preponderance of the evidence can be shown through "evidence of use of a unique, secure username and password." *Smith v. Rent-A-Center, Inc.*, No. 1:18-CV-01351 LJO JLT, 2019 WL 1294443, at *5–6 (E.D. Cal. Mar. 21, 2019) (finding Defendant did not show by a preponderance of the evidence that a contract had been signed where Defendant declarant did not "explain how he inferred that it was Plaintiff who created and entered the password, how he

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO COMPEL ARBITRATION (DKT. NO. 23) - 7

ascertained that the electronic signature was the act of Plaintiff, or how he determined that the form was signed" on the alleged date).

Here, while Defendant did not provide a signed copy of Jackson's arbitration agreement, Defendant's Human Resources Information Systems Director ("Director") provided evidence of Jackson's completed "Employment At Will and Arbitration Agreement" as well as a copy of the agreement. (Dkt. Nos. 23-1 at 8–13; 32-1 at 2). The Director also detailed the process for determining how Defendant tracked employee signatures. Jackson was required to use a "multi-factor verification process that includes verifying the individual's identity through text message or call back" and create his own profile "with a unique username and password." (Dkt. No. 23-1 at 4–5.) Only Jackson knew the password and neither he nor Defendant would have been able to change his forms after completion. (*Id.*) Jackson's failure to remember signing an arbitration agreement is insufficient to establish doubt that these records are not accurate. *See Simpson v. Inter-Con Sec. Sys., Inc.*, No. C12-1955RAJ, 2013 WL 1966145, at *5 (W.D. Wash. May 10, 2013) ("His mere assertion that he does not remember signing the agreement is insufficient to create a genuine issue of material fact."). Accordingly, Defendant shows by a preponderance of the evidence that Jackson signed his arbitration agreement.

### 2. Jackson falls within the FAA's transportation workers exemption.

As identified in *Rittman v. Amazon.com, Inc.* 971 F.3d 904 (9th Cir. 2020), even though Jackson and Defendant contracted to be governed by the FAA, the FAA's limitations on Court oversight of arbitration agreements does not apply when individuals fall in the transportation workers exemption. 971 F.3d at 920. To determine if an individual falls in the FAA's transportation workers exemption, the two step *Saxon* test is used.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO COMPEL ARBITRATION (DKT. NO. 23) - 8

Under the first step, the Court must identify to what class of workers Jackson belonged. *Saxon*, 596 at 455.  The plaintiffs frame themselves as being in the class of workers who "load[] and unload[] trucks" that transport freight across state lines.  (Dkt. No. 26 at 13.)  More specifically, Jackson refers to his role with Defendant as forklift operator (Dkt. No. 28 at 1) while Director of Operations Rebeca Barrios refers to his role as freight handler (Dkt. No. 36 at 2).  Barrios describes the work of a freight handler as primarily "us[ing] machinery" to sort freight and load it onto pallets that will then be placed on outbound trucks; the remaining work is unloading freight from inbound trucks.  (*Id.*)  Barrios states freight handlers do not load trailers. (*Id.*)  Jackson testifies he "moved pallets off incoming trucks into the warehouse." (Dkt. No. 28 at 2).  He also testifies that he "moved pallets from the warehouse onto outbound trucks." (*Id.*) Jackson estimates "at least half of the trucks I worked on had plates from states other than Washington." (*Id.*)  He also confirms he "regularly unloaded" freight from companies that originate outside of Washington. (*Id.*)[3]  The Court finds Jackson belonged to a class of workers that include freight handlers/forklift operators.

Under the second *Saxon* step, the Court must determine whether freight handlers/forklift operators "play a direct and necessary role in the free flow of goods across borders."  596 U.S. at 458 (internal citation omitted).  Jackson's class of workers loaded freight that would eventually be placed on trucks bound for interstate commerce and unloaded freight from trucks coming from interstate commerce; it is disputed whether the class directly loaded or unloaded trucks bound for interstate commerce.  In the event Jackson's class did directly use forklifts to load pallets on or off trucks working in interstate commerce, then Jackson is directly analogous to the

---

[3]  While the *Saxon* test looks at what the class of workers and not the individual do, the Court uses Jackson's testimony to better understand what individuals in his role do.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO COMPEL ARBITRATION (DKT. NO. 23) - 9

airline cargo workers in *Saxon*. In the same way the *Saxon* workers loaded and unloaded cargo on and off planes that were used in interstate commerce, Jackson loaded pallets on and off trucks that were used in interstate commerce.

However, even if Jackson did not directly load the trucks himself, the Court finds *Sayaseng* persuasive. In this circumstance, the class of workers is one step more removed from interstate commerce than the airline cargo workers in *Saxon*. The workers only placed the items on the pallets that were to be loaded onto the truck (or unloaded pallets from inbound trucks), they did not directly load anything on or off the trucks. But like the individuals in *Sayaseng*, the workers prepared units of "outbound shipment[s]" that were then loaded and transported across state lines. (Dkt. No. 29 at 1–2.) This process of preparing cargo for shipment is sufficiently "intimately involved with the commerce (*e.g.*, transportation) of that cargo" that the workers play a "direct and necessary role in the free flow of goods across borders." *Saxon*, 596 U.S. at 458 (internal citation omitted). Accordingly, Jackson is governed by the transportation workers exemption.

### 3. Jackson's class claims waiver provision is unenforceable.

The agreement contains a savings clause that purports to sever any portion of the agreement deemed void or unenforceable with one distinct exception that applies to the class claims waiver: "if the waiver of class and collective claims is found to be unenforceable, then any claim brought on a class, collective, or representative action basis ***must be filed*** in a court of competent jurisdiction, and such court shall be the exclusive forum for such claims." (Dkt. 23-1 at 10) (emphasis added). Thus, if the class claims waiver is void or unenforceable, Jackson's class claims are not subject to arbitration as Jackson is required to file such claims exclusively in a court of competent jurisdiction, not via arbitration.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO COMPEL ARBITRATION (DKT. NO. 23) - 10

Having deemed the FAA inapplicable to the arbitration agreement, the remainder of the arbitration agreement is void as to what choice-of-law should apply to the arbitration agreement. A "federal court sitting in diversity ordinarily must follow the choice-of-law rules of the State in which it sits." *Atlantic Marine Const. Co., Inc. v. U.S. Dist. Court for Western District of Texas*, 571 U.S. 49, 65 (2013); *In re Facebook Biometric Information Privacy Litigation*, 185 F. Supp. 3d 1155, 1167 (9th Cir. 2016). "This applies in actions brought under the Class Action Fairness Act as well, since CAFA is based upon diversity jurisdiction." *In re Facebook*, 185 F. Supp. 3d at 1168 (quoting *In re NVIDIA GPU Litig.*, No. C 08-04312, 2009 WL 4020104, at *5 (N.D. Cal. No. 19, 2009)).

Here, Defendant used CAFA to invoke the Court's jurisdiction. (*See* Dkt. No. 1.) And because Jackson's arbitration agreement is silent as to what law should govern the remaining terms of the arbitration agreement,[4] this Court, sitting in Washington, will apply Washington law to determine whether the class waiver is void and enforceable.

Under Washington law, class action waivers in cases involving wage and hour violations are unenforceable. *Scott v. Cingular Wireless LLC*, 161 P.3d 1000, 1009 (Wash. 2007) (Where many plaintiffs have the "same or similar complaint and each is damaged a small amount, class action litigation or arbitration is the only practical remedy available. Under such circumstances, the class action waiver is substantively unconscionable."). Thus, the class action waiver in Jackson's arbitration agreement is unenforceable.

---

[4] Arguably, the absence of any agreement as to what law applies, in the event the FAA does not, could lead to the conclusion that there is no agreement to arbitrate. *See Rittman*, 971 F.3d at 909 (agreeing there was no valid arbitration agreement where the district court "determined it was not clear what law would apply . . . , or whether the parties intended to arbitrate disputes in the event the FAA did not apply.").

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO COMPEL ARBITRATION (DKT. NO. 23) - 11

Defendant argues that the agreement "does not reflect an agreement to arbitrate on a class basis" and further argues even if the class action waiver is unenforceable, the language in section 2 of the arbitration agreement still requires Jackson use binding arbitration to resolve his claim. (Dkt. No. 31 at 16.) But the plain language of the savings clause, section 12, specifically identifies that upon the class waiver being found unenforceable, a class action claim "must be filed in a court" and "such court shall be the exclusive forum for such claims." (Dkt. No. 23-1 at 10.) Defendant's arguments are rejected by the plain language of the agreement.

Accordingly, Jackson may not only pursue his class action claims in this forum, but by the terms of the arbitration agreement, he is now required to pursue them in this forum because Defendant removed this matter from state court.

**B. Quindt must individually arbitrate his claims.**

1. Quindt's contract is not per se invalid.

Plaintiffs do not challenge that Quindt signed an arbitration agreement on June 3, 2025, nor do they challenge that the asserted claims are within that agreement's scope. However, Plaintiffs bring three challenges to the contract's formation. Plaintiffs argue Quindt's agreement lacked consideration because Quindt did not perform any work after the agreement was signed. (Dkt. No. 26 at 17.) Plaintiffs also argue that Quindt's agreement lacked mutual assent and is procedurally unconscionable. (*Id*. at 17–18.) Plaintiffs rely on two timing arguments for these claims. First, Plaintiffs argue, the agreement was signed nearly a year after Quindt worked for Defendant; Quindt did no work for Defendant after signing it and no reasonable person would understand the agreement to be controlling his prior employment. (*Id*.) Second, Plaintiff argues the timing of the orientation invitation raises suspicion. The invitation and the orientation program occurred less than one month after Quindt's counsel requested his personnel records,

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO COMPEL ARBITRATION (DKT. NO. 23) - 12

including arbitration agreements.  Only then did Defendant send an arbitration agreement to Quindt's counsel.  (*Id.*)  While the Court expresses skepticism about the timing, ultimately Plaintiffs' arguments are unpersuasive.

Courts "apply state-law principles that govern the formation of contracts to determine whether a valid arbitration agreement exists."  *Lowden v. T-Mobile USA, Inc.*, 512 F.3d 1213, 1217 (9th Cir. 2008). First, as to the issue of mutual assent, sufficient evidence supports the finding that Quindt and Defendant mutually assented to arbitrate claims arising from both before and after the agreement was signed.  Mutual assent exists where both parties assent "to 'the same bargain at the same time,'" and where both parties had "notice of the arbitration agreement." *Showalter v. Apartment Mgmt. Consultants LLC*, 754 F. Supp. 3d 1074, 1078 (W.D. Wash. 2024) (quoting *Burnett v. Pagliacci Pizza, Inc.*, 470 P.3d 486, 486 (2020)).  Courts will find mutual assent to any term that can be understood through a "common-sense" reading by "an average person." *Empire Health Found. v. CHS/Cmty. Health Sys., Inc.*, 370 F. Supp. 3d 1252, 1259–1260 (E.D. Wash. 2019).  Mutual assent requires only that a party "acknowledge that he signed the agreement and it was described to him." *Showalter*, 754 F. Supp. 3d at 1079.  Here, Quindt initialed and signed the arbitration agreement.  (Dkt. No. 23-1 at 16, 23.)  He was able to read the document at his own pace and no terms were hidden.  Moreover, Section 1 of the agreement clearly makes the agreement retroactive.  (*Id*. at 15.)  Accordingly, there is mutual assent.  Any issues regarding the timing of the agreement go only to procedural unconscionability rather than mutual assent. *See Showalter*, 754 F. Supp. 3d at 1079 ("Showalter's argument that he 'felt hurried' by Carter and did not have a reasonable opportunity to review or negotiate the Arbitration Agreement may go to his procedural unconscionability claim, but it does not negate his assent.").

Additionally, consideration supported the agreement.  As Defendant argues, the mutual agreement to arbitrate is on its own sufficient to constitute consideration.  (Dkt. No. 31 at 9–10.) "Consideration is a bargained-for exchange of promises," or "any act, forbearance, creation, modification or destruction of a legal relationship, or return promise given in exchange." *Labriola v. Pollard Grp., Inc.*, 100 P.3d 791, 793 (Wash. 2005) (internal quotation omitted). And "mutual promises to forgo a jury trial and arbitrate are sufficient to create a bilateral contract under Washington law."  *Sellman v. Boehringer Ingelheim Pharms. Inc.*, No. C21-1105-JCC, 2021 WL 4989448, at *3 (W.D. Wash. Oct. 27, 2021; *see also Parrish v. Valero Retail Holdings, Inc.*, 727 F. Supp. 2d 1266, 1280 (D. N.M. 2010) ("mutual obligation to arbitrate serves a separate basis for consideration"); *Levine v. Vitamin Cottage Nat. Food Markers, Inc.*, No. 20-cv-00261-STV, 2021 WL 4439800, at *11 (D. Colo. Sept. 27, 2021) ("mutual promises to arbitrate does constitute sufficient consideration for agreement").

Here, Quindt and Defendant provided mutual promises to arbitrate any claims between them.  (*See* Dkt. No. 23-1 at 15) ("**any claim, controversy, or dispute between the Parties**" must go to arbitration) (emphasis added); (*see also id.* at 19) ("This Arbitration Agreement constitutes the entire agreement between Capstone and Employee… No modification or amendment to this Arbitration Agreement is binding unless in writing and signed by both Capstone and Employee.").  And although it might be argued that the consideration given was of little value, "[c]ourts generally do not inquire into the adequacy of consideration and instead utilize a legal sufficiency test." *Labriola*, 100 P.3d at 794.  The mutual promises, no matter the value, were legally sufficient for purposes of consideration.

Finally, Quindt's agreement with Defendant was not procedurally unconscionable. Procedural unconscionability looks at: "(1) the manner in which the contract was entered, (2)

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO COMPEL ARBITRATION (DKT. NO. 23) - 14

whether [the plaintiff] had a reasonable opportunity to understand the terms of the contract, and (3) whether the important terms were hidden in a maze of fine print to determine whether a party lacked a meaningful choice." *Burnett*, 470 P.3d at 495.

> At minimum, an employee who asserts an arbitration agreement is procedurally unconscionable must show some evidence that the employer refused to respond to her questions or concerns, placed undue pressure on her to sign the agreement without providing her a reasonable opportunity to consider its terms, and/or that that the terms of the agreement were set forth in such a way that an average person could not understand them.

*Zuver v. Airtouch Comm'cns, Inc.*, 103 P.3d 753, 761 (Wash. 2004). Plaintiffs provide no case law in support of their proposition that the timing of the agreement either in relation to Quindt's employment or Quindt's legal activity is procedurally unconscionable. (Dkt. No. 26 at 17–18.) There is no evidence Defendant supervisors refused to answer Quindt's questions about the agreement, pressured Quindt into signing the agreement, or hid any material fact of the agreement. (Dkt. No. 31 at 6–7.) Notably, Quindt had the opportunity to revoke his consent even after signing. (Dkt. No. 23-1 at 18.) Accordingly, while the timing of the arbitration agreement raises concerns to the Court, the facts as alleged ultimately do not support a finding of procedural unconscionability.

> 2. Quindt falls within the FAA's transportation workers exemption.

Like Jackson, Quindt was involved in the loading and unloading of inbound and outbound trucks. Specifically, Quindt refers to his role with Defendant as a warehouse facility employee (Dkt. No. 29 at 1) while Director of Operations Craig Withers refers to his role as being a part of a "set of employees responsible for stack down" (Dkt. No. 34 at 2). Withers identifies the role of these "stack down" employees as, after freight is scanned by intended destination and placed on a "decline," "bringing the freight from the decline to a corresponding pallet." (*Id.*) Withers states these "stack down" employees do not load the pallets onto trailers

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO COMPEL ARBITRATION (DKT. NO. 23) - 15

or transport the freight to other stores. (*Id.*) Quindt describes his role as "tak[ing] freight that came into the warehouse on conveyor lines, sort[ing] it, and plac[ing] it onto pallets for outbound shipment." (Dkt. No. 29 at 1.) Quindt acknowledges forklift operators would then move the pallets he filled onto trucks. (*Id.* at 2.) Quindt testifies "most of the freight [he] handled was labeled or described as being shipped to locations outside Washington." (*Id.*) The Court finds Quindt belonged to a "stack-down" class of workers.

Here, Quindt's class of workers loaded pallets that were then placed on trucks bound for interstate commerce. It is undisputed that Quindt's class of workers did not personally load or unload the inbound or outbound trucks. But as discussed previously, the Court finds *Sayaseng* persuasive. Like the *Sayaseng* employees, Quindt's class of workers was involved in loading and unloading goods such that they played a "direct and necessary role in the free flow of goods across borders." *Saxon*, 596 U.S. at 458 (internal citation omitted). Accordingly, the FAA does not apply to Quindt's arbitration agreement.

3. Quindt is governed by Georgia state law and the class action waiver in his arbitration agreement is enforceable.

In contrast to Jackson, Quindt's arbitration agreement identifies that if the FAA is deemed to be inapplicable, the "Arbitration Agreement will be governed by the arbitration laws of the State of Georgia." (Dkt. No. 23-1 at 15.) Plaintiffs concede Georgia permits class action waivers. (*See* Dkt. No. 26 at 15.) Plaintiffs argue that it is inappropriate to apply Georgia law given that Quindt is based entirely in Washington. (*Id.* at 15–16).

As previously identified, where a court's jurisdiction is based on CAFA, it is based on diversity jurisdiction and the court will follow the choice-of-law of the state in which it sits. *In re Facebook*, 185 F. Supp. 2d at 1168. "Washington courts apply § 187 of the Restatement

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO COMPEL ARBITRATION (DKT. NO. 23) - 16

(Second) Conflict of Laws" to determine whether choice-of-law provisions should be enforced. *Amazon.com, Inc. v. Powers*, No, C12-1911RAJ, 2012 WL 6726538, at *11 (W.D. Wash. Dec. 27, 2012). Under § 187, a choice of law provision will be enforced unless (1) there is "no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice," *id*. (quoting § 187(2)(a)), or (2) all three of the following conditions are met: "[1] without the provision, Washington law would apply; [2] [] the chosen state's law violates a fundamental public policy of Washington; and [3] [] Washington's interest in the determination of the issue materially outweighs the chosen state's interest." *McKee v. AT&T Corp*, 191 P.3d 845, 851(Wash. 2008); *see also Eckstein v. E. Coast Facilities*, No. C21-257 MJP, 2021 WL 3173044, at *3 (W.D. Wash. July 26, 2021).

Here, there is a substantial relationship between the Georgia choice-of-law provision and the parties; namely, Defendant's principal place of business is in Georgia (Dkt. No. 20 at 2) and, therefore, it would be reasonable for the parties to have chosen Georgia law. Thus, the agreement to apply Georgia law is enforceable under the first test found in § 187(2)(a).

Regarding the second test, the last criteria—whether Washington's interest materially outweighs Georgia's (the chosen state's) interest—is not met. Each state has an interest in applying their own law to their own citizens. The Court cannot conclude that Washington has a greater interest in allowing its citizen (Quindt) to pursue a class action wage loss lawsuit than the interest Georgia has in enforcing a class action waiver used by its citizen.[5] Accordingly, Quindt

---

[5] The Parties do not fully brief whether in the context of a wage loss claim Georgia enforces class action waivers. Instead, Plaintiff concedes that Georgia "permits enforcement of class-action waivers" (Dkt. No. 26 at 15), a proposition that Defendant agrees with (Dkt. No. 31 at 15). In *Honig v. Comcast of Georgia I, LLC*, 537 F. Supp. 2d 1277 (N.D. Ga. 2008), the court analyzed whether a class action waiver in a cable provider contract was enforceable. Among the various reasons supporting enforcement of the class action waiver in that case, most important

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO COMPEL ARBITRATION (DKT. NO. 23) - 17

is bound by his arbitration agreement, which is governed by the laws of Georgia, and the class action waiver in his contract binds him to individual arbitration pursuant to their agreement.

### IV    CONCLUSION

Having considered Defendant's motion to compel arbitration (Dkt. No. 23), the briefing of the parties, and the remainder of the record, the Court finds and ORDERS that Defendant's motion to compel arbitration (Dkt. No. 23) is GRANTED in part and DENIED in part. Defendant's motion to compel arbitration is GRANTED as to Plaintiff Quindt; Quindt must litigate any covered claims through individual arbitration.  Defendant's motion to compel arbitration is DENIED as to Plaintiff Jackson; Jackson may, and in fact must, proceed with this putative class action before this Court under the terms of his arbitration agreement.

Dated this 29th day of January, 2026.



David G. Estudillo
United States District Judge

---

was the fact that the plaintiff "was free to reject the terms of the arbitration provision without a single adverse consequence." *Id*. at 1289.  As in *Honig*, Quindt had the ability to revoke or reject the arbitration agreement in this case.  Based on *Honig* and the Parties' position, the Court will conclude Georgia allows class action waivers in wage loss claims.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO COMPEL ARBITRATION (DKT. NO. 23) - 18